IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Donna Moore Glenn, | ) | Civil Action No. 8:13-02099-BHH-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2] For the reasons set forth below, it is recommended that the decision of the Commissioner be reversed and remanded for administrative action consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

## PROCEDURAL HISTORY

On April 7, 2009, Plaintiff filed applications for DIB and SSI, alleging disability beginning April 1, 2000. [R. 159–60, 152–58.] The claims were denied initially and upon reconsideration [R. 129–33, 135–38] by the Social Security Administration ("the Administration"). Plaintiff filed a request for hearing before an administrative law judge ("ALJ"), and on December 6, 2011[3], ALJ Gregory M. Wilson held a hearing on Plaintiff's claims [R. 87–116].

On March 16, 2012, the ALJ issued his decision, finding Plaintiff not disabled. [R. 9–44.] At Step 1[4], the ALJ found Plaintiff last met the insured status requirements of the Social Security Act ("the Act") on September 30, 2011, and had not engaged in substantial gainful activity since April 1, 2000, the alleged onset date [R. 11, Findings 1 & 2.] At Step 2, the ALJ found Plaintiff had the following severe impairments: recurrent calluses and cysts/plantar fibroma, degenerative joint disease of the cervical spine, borderline intellectual functioning, depression, anxiety, and alcohol dependence. [R. 12, Finding 3.] The ALJ also found Plaintiff had the following non-severe impairments: hypertension, residual complications following removal of ovarian cysts, back problems, insomnia, respiratory infections/sinusitis, headaches, and wrist problems. [*Id.*]

At Step 3, the ALJ determined Plaintiff's impairments or combination of impairments do not meet or medically equal the severity of one of the listed impairments. [R. 12–15,

---

[3]Plaintiff's initial hearing on June 13, 2011, was continued to allow Plaintiff time to obtain counsel or a representative. [R. 117–21.]

[4]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

Finding 4.] The ALJ specifically considered Listing 1.00 with respect to the severity of the symptoms affecting Plaintiff's foot and neck; and Listings 12.02, 12.04, 12.06 and 12.09 with respect to Plaintiff's mental impairments. [*Id.*] The ALJ also considered Listing 12.05 during his RFC analysis. [*See* R. 18–30.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found that Plaintiff retained the following residual functional capacity ("RFC"):

> I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). The claimant could lift or carry up to 50 pounds at one time and 25 pounds frequently. The claimant could sit, stand, and walk up to six hours each out of an eight-hour workday. The claimant could perform simple, one or two-step tasks in a low stress work environment characterized by no production work, such as on an assembly line where the individual would produce or assemble a product in a high-speed manner and no public contact.

[R. 15–16, Finding 5.]   Based on this RFC, at Step 4, the ALJ determined Plaintiff was capable of performing her past relevant work as a housekeeper.[5] [R. 42, Finding 6.] Thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from April 1, 2000, through the date of the decision, nor was she entitled to SSI based on her April 7, 2009, application. [R. 44.]

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council [R. 4–5], which denied review on May 29, 2013. [R. 1–3.] Plaintiff commenced an action for judicial review in this Court on August 2, 2013. [Doc. 1.]

---

[5]In the alternative, the ALJ found there are other jobs that exist in significant numbers in the national economy that Plaintiff also can perform. [R. 43.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and contains multiple legal and factual errors warranting the reversal and remand of the case. [Doc. 24 at 26.]  Specifically, Plaintiff contends the ALJ

1. Improperly rejected medical opinions of record establishing Plaintiff's IQ meets Listing 12.05C, and erred by finding Plaintiff did not have deficits in adaptive functioning as required by the Listing; and

2. Failed to include all of Plaintiff's physical and mental limitations in the RFC determination.

Additionally, Plaintiff contends the ALJ failed to meaningfully address Plaintiff's complaints of pain from her neck and carpal tunnel syndrome, and he "neglected his duty to develop the record by failing to obtain or inquire about the records associated with [Plaintiff's] testing and treatment for carpal tunnel syndrome and by not ordering a physical consultative examination given [Plaintiff's] inability to afford treatment during much of the relevant time period." [*Id.* at 20.]

The Commissioner contends the ALJ's decision should be affirmed because there is substantial evidence of record that Plaintiff was not disabled from April 1, 2000, her alleged onset date, through March 16, 2012, the date of the ALJ's decision.  [Doc. 28 at 32.]  Specifically, the Commissioner contends the ALJ

1. Properly found Plaintiff did not sustain her burden of establishing that she met Listing 12.05C; and,

2. Correctly determined Plaintiff's RFC.

The Commissioner further argues the ALJ acted within the bounds of his discretion concerning the development of the record and was not obligated to order a consultative exam with respect to Plaintiff's physical allegations.

4

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence.

5

*See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"  *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."  *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim.  *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court

6

to find the claimant disabled).    Where the court cannot discern the basis for the

Commissioner's decision, a remand under sentence four is usually the proper course to

allow the Commissioner to explain the basis for the decision or for additional investigation.

*See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light

Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176,

1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its

reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v.

Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor

the Appeals Council indicated the weight given to relevant evidence).    On remand under

sentence four, the ALJ should review the case on a complete record, including any new

material evidence.    *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant

may produce further evidence on remand.").    After a remand under sentence four, the court

enters a final and immediately appealable judgment and then loses jurisdiction.    *Sargent*,

941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be
> taken before the Commissioner of Social Security, but only
> upon a showing that there is new evidence which is material
> and that there is good cause for the failure to incorporate such
> evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).    A reviewing court may remand a case to the Commissioner on the

basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the

determination of disability at the time the application was first filed; (2) the evidence is

material to the extent that the Commissioner's decision might reasonably have been

different had the new evidence been before him; (3) there is good cause for the claimant's

failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[6]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

---

[6]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five,

9

the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined

10

effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C.    *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[7]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[8] with the physical and mental demands of the kind

---

[7]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[8]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work. 20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids"). Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[9]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations). When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines. *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work. 20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is

---

[9]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a). A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands. *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. 20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c). Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ determination coming down on the side of a non-examining, non-treating physician's

opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. §§ 404.1517, 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723

(4th Cir. 2005) (unpublished opinion).  First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'"  *Id.* (quoting *Craig*, 76 F.3d at 594).  Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain."  *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs."  *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §§ 404.1528, 416.928.  Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the following "Policy Interpretation Ruling":

16

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed. Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485; *see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

17

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

### Listing 12.05C

Plaintiff contends the ALJ erred by failing to find that the severity of Plaintiff's mental impairments met or equaled Listing 12.05C.  [Doc. 24 at 5.]  Specifically, Plaintiff challenges the ALJ's rejection of Plaintiff's IQ scores which fall into the range of the Listing [*id.* at 5–11], as well as the ALJ's failure to find that Plaintiff exhibited the requisite deficits in adaptive functioning necessary to meet the Listing [*id.* at 11–15].  To the contrary, the Commissioner contends the ALJ properly weighed the IQ scores in the record and articulated his reasons for finding certain scores inconsistent with the record.  [Doc. 28 at 19–22.]  The Commissioner also argues Plaintiff did not sustain her burden of establishing deficits in adaptive functioning and the ALJ properly emphasized facts of record concerning

Plaintiff's adaptive functioning. [Doc. 28 at 15–18.] The Court finds the ALJ erred during his Step 3 analysis.

### Criteria of Listing 12.05C

To determine whether a claimant's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the claimant's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that without identifying the relevant listings and comparing the claimant's symptoms to the listing criteria, "it is simply impossible to tell whether there was substantial evidence to support the determination"); *Gilbert v. Colvin*, C/A No. 8:13-1561-JFA-JDA, 2014 WL 4809923, at *12 (D.S.C. Sept. 26, 2014) (explaining that where there is "'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals" it.) (citations omitted).  In this case, while the ALJ failed to identify Listing 12.05C as a relevant listing during his Step 3 analysis[10], the ALJ did discuss Listing 12.05 during his RFC analysis.  [*See* R. 25–30.] Listing 12.05C reads as follows:

> Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .

---

[10]Plaintiff does not challenge the ALJ's failure to address Listing 12.05C during Step 3 of the evaluation process.

        C. A valid verbal, performance, or full scale IQ of 60 through 70
        and a physical or other mental impairment imposing an
        additional and significant work-related limitation of function;

    . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

To meet Listing 12.05, a claimant must satisfy the "diagnostic description" in the introductory paragraph and any one of the four sets of criteria—A, B, C, or D. *Id.* § 12.00A. The diagnostic description describes intellectual disability as "significantly sub-average general intellectual functioning with deficits in adaptive functioning." *Id.* § 12.05. The Administration "has never adopted a standard of measurement for the term 'deficits in adaptive functioning' in the capsule definition of Listing 12.05." *Wall v. Astrue*, 561 F.3d 1048, 1073 (10th Cir. 2009) (Holloway, C.J., dissenting). The Administration has noted, however, that it permits use of any of the measurement methods recognized and endorsed by any of the four major professional organizations dealing with mental retardation. *Id.* at 1074; *but see Cox v. Astrue*, 495 F.3d 614, 618 n.4 (8th Cir. 2007) (noting that "the medical standard for mental retardation is not identical to the legal standard"). Medical professional organizations have stated that deficits in "adaptive functioning" can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *See Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) (relying on two American medical associations). Further, to satisfy the "diagnostic description" in the introductory paragraph, the claimant's deficits in adaptive functioning must have "initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

### *Deficits in Adaptive Functioning*

A review of case law suggests that the issue of whether a claimant manifested deficits in adaptive functioning during the developmental period is a fact-specific inquiry with few bright-line rules. *Accord Salmons v. Astrue*, No. 5:10CV195–RLV, 2012 WL 1884485, at *5–7 (W.D.N.C. May 23, 2012). Cases interpreting Listing 12.05C provide some parameters for an ALJ's conclusion on this issue. *Compare Hancock v. Astrue*, 667 F.3d 470, 475–76 (4th Cir. 2012) (affirming Commissioner's determination that claimant did not have the requisite deficits in adaptive functioning where the claimant had worked as a battery assembler and a drop clipper; performed tasks such as shopping, paying bills, and making change; took care of three small grandchildren at level acceptable to the state Department of Social Services; did a majority of the household chores, attended school to obtain a GED; and did puzzles for entertainment), *with Rivers v. Astrue*, C/A No. 8:10–314–RMG, 2011 WL 2581447 (D.S.C. June 28, 2011) (reversing finding of no deficits in adaptive functioning where claimant was functionally illiterate, showed poor academic performance with multiple IQ tests in or before the third grade showing scores in the 50s, and dropped out of school in the ninth grade).

Functional illiteracy in and of itself is a deficit in adaptive functioning. *Davis v. Astrue*, C/A No. 2:07-1621-JFA-RSC, 2008 WL 1826493, at *4 (D.S.C. Apr. 23, 2008) (citing the Diagnostic and Statistical Manual, Fourth Edition ("DSM-IV-TR")); *see also Luckey v. Dep't of Health & Human Servs.*, 890 F.2d 666, 668–69 (4th Cir. 1989); *Salmons*, 2012 W L 1884485, at *7; *Holtsclaw v. Astrue*, No. 1:10CV199, 2011 WL 6935499, at *4 (W.D.N.C. Dec. 30, 2011); *Rivers*, 2011 WL 2581447, at *3–4. Similarly, whether the claimant has ever lived independently is a relevant inquiry. *Compare Salmons*, 2012 WL

1884485, at *4, *with Holtsclaw*, 2011 WL 6935499, at *5. Another guiding factor is whether the claimant has ever provided care for others, or, conversely, whether he himself is dependent on others for care. *Compare Salmons*, 2012 WL 1884485, at *7 (noting claimant was heavily dependent on his mother and was not responsible for the care or supervision of anyone else) and *Holtsclaw*, 2011 WL 6935499, at *4–5 (noting claimant had never lived independently and required a parent's help), *with Hancock*, 667 F.3d at 475–76 (affirming denial of benefits where the claimant managed the household and cared for her three young grandchildren) and *Caldwell v. Astrue*, No. 1:09cv233, 2011 WL 4945959, at *3 (W.D.N .C.Oct.18, 2011) (noting claimant assisted in the care of an elderly parent).

### *Manifestation During the Developmental Period*

The Fourth Circuit has recognized that the regulations "expressly define mental retardation as denoting 'a lifelong condition.'" *Branham*, 775 F.2d at 1274 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(B)(4)). A claimant does not have to present evidence of an IQ test before age 22 to be found mentally retarded under Listing 12.05. *See id.* (stating that "there may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life"). Evidence of illiteracy despite a claimant's education supports a finding that the claimant's mental retardation occurred before age 22. *Turner v. Bowen*, 856 F.2d 695, 699 (4th Cir. 1988). Additionally, a medical diagnosis of mental retardation supports a finding that the claimant's mental retardation occurred before age 22. *See* DSM-IV-TR (stating that a diagnosis of mental retardation requires an onset before age 18). Moreover, "in the absence of any evidence of a change in a claimant's intelligence functioning, it *must be assumed* that the

22

claimant's IQ remained relatively constant." *Luckey*, 890 F.2d at 668 (citing *Branham*, 775 F.2d at 1274) (emphasis added).

School records and past academic performance are important indicators of deficits in adaptive functioning prior to age 22. *See Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skills is the primary measure of deficits of adaptive functioning before age 22."); *Rivers*, 2011 WL 2581447, at *3 (noting that claimant was classified as special needs at school, had repeated evaluations in elementary school with IQ scores all in the 50s, and dropped out of school in the ninth grade); *see also Conyers v. Astrue*, No. 4:11-CV-37-D, 2012 WL 3282329, at *8–9 (E.D.N.C. June 29, 2012) (discussing the claimant's school history).  Additionally, work history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, *Luckey*, 890 F.2d at 669, can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. *Hancock*, 667 F.3d at 475–76 (concluding the ALJ's finding that the claimant did not manifest requisite deficits in adaptive functioning to be supported by substantial evidence because the ALJ considered, among many other factors, that the claimant had worked several jobs); *Harts v. Astrue*, C/A No. 0:10-1893-CMC-PJG, 2012 WL 529982, at *6 n. 3 (D.S.C. Jan. 30, 2012) (distinguishing *Luckey* because the ALJ used the claimant's work history as only one factor to support his finding of no significant deficits in adaptive functioning and because the claimant in Harts did not otherwise meet the Listing 12.05C criterion of a valid IQ score within the range of 60–70), *Report and Recommendation adopted*, 2012 WL 529980 (D.S.C. Feb. 17, 2012); *Davis*, 2008 WL 1826493, at *4 (fact that Plaintiff had worked for 33 years as a cleaning lady did not bar her award of benefits where her impairment met Listing 12.05C).  Finally, the tasks a claimant is able to

undertake, although not determinative, have been considered in this analysis.  *See*
*generally Radford v. Astrue*, No. 5:08–CV–421–FL, 2009 WL 1675958, at *6 (E.D.N.C.
June 10, 2009) (finding that the claimant's ability to perform certain tasks was not
inconsistent with mild mental retardation); *Hancock*, 667 F.3d at 476 & n. 3 (affirming ALJ's
consideration of the claimant's ability to perform tasks such as shopping, paying bills, and
making change); *Salmons*, 2012 WL 1884485, at *7 (discussing claimant's inability to do
household chores, cook, and drive).

### Relevant Medical History

A Short-Term Evaluation Report from South Carolina Vocational Rehabilitation
("SCVR") dated May 1992[11] documented Plaintiff's functional limitations as including: an
inability to "qualify for work requiring a [] diploma"; inability to perform work requiring a high
degree of literacy or abstract thinking; inability to complete successfully any tasks requiring
a high degree of fingering/hand dexterity; inability to have adequate transportation to and
from work; and an inability to avoid societal run-ins (2 arrests for fighting). [R. 261.]
Plaintiff, however, was found to be functioning in the borderline defective range and, thus,
failed to meet the SCVR criteria for mental retardation. [*Id.*]

In an evaluation for the SCDDSN dated September 16, 2009, Thomas Kirby, Ph.D.
("Dr. Kirby") noted the purpose of the evaluation was to assess Plaintiff's levels of
intellectual functioning and adaptive behavior.  [R. 310.]  Psychological testing resulted in
a Verbal IQ of 70, a Performance IQ of 68, and a Full Scale IQ ("FSIQ") of 66 on the
Wechsler Adult Intelligence Scale 3rd edition ("WAIS"), with a Confidence Interval for her

---

[11]At the time, Plaintiff was 30 years old.

FSIQ at the 95% level, or between 63-71.  [R. 311.] Plaintiff demonstrated fairly good vocabulary and basic skills in her memory for digits and in her knowledge of information; however, she was weak in her comprehension of simple social situations and was very weak in arithmetic where she could do only one digit addition and subtraction problems. [*Id.*]  Dr. Kirby noted that Plaintiff tested on a second-grade level for reading, wrote simple correspondence, had all of her self-help skills, took her medication as needed, lived alone, cleaned her apartment, and did basic cooking. [R. 311–12.]  Dr. Kirby concluded Plaintiff functioned in the mild range intellectually and in the moderate range adaptively. [R. 312.]

A subsequent mental status evaluation was performed by Robert D. Phillips, Ph.D. ("Dr. Phillips") on September 22, 2009, to determine Plaintiff's eligibility for SSI benefits. [R. 314.]  Test results from the Wide Range Achievement Test ("WRAT-3") administered by Dr. Phillips showed Plaintiff reading at a grade equivalent of high school; spelling at a grade equivalent of 6th grade; and arithmetic at a grade equivalent of 5th grade.  [R. 315.] Dr. Phillips noted Plaintiff's scores reflect a somewhat reduced ability in math and spelling. [*Id.*]  Dr. Phillips also noted Plaintiff "appears to have a history of fairly good academic ability as judged by her current level of ability on the WRAT-3."  [R. 316.]  Dr. Phillips concluded that Plaintiff's ability to work is reduced more by her drinking than her mental state.  [*Id.*]

A Psychiatric Review Technique form completed by Craig Horn, Ph.D. ("Dr. Horn") on October 14, 2009, indicated consideration of Listings 12.02 and 12.09 [R. 318], and noted mild limitations in activities of daily living and social functioning, moderate limitations in concentration, persistence and pace; and no episodes of decompensation.  [R. 328].  A

Mental RFC completed by Dr. Horn on the same day, again addressed Listings 12.02 and 12.09, indicated that Plaintiff was moderately limited in the following areas:

1.    The ability to understand and remember detailed instructions
2.    The ability to carry out detailed instructions
3.    The ability to maintain attention and concentration for extended periods of time

[R. 332.]  Dr. Horn found, among other things, however, that Plaintiff was not significantly limited in her ability to interact appropriately with the general public or in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. [R. 333.]

A Psychiatric Review Technique form completed by Larry Clanton, Ph.D. ("Dr. Clanton") on July 16, 2010, considered Listings 12.02 and 12.09, and found Plaintiff had a Borderline IQ, based on the 1992 SCDDSN testing, but dismissed Plaintiff's claim of mental retardation based on her 2009 WAIS score "because of previous tests results and functional information." [R. 337–38.]  Dr. Clanton also found Plaintiff had a medically determinable impairment of alcohol dependency.  [R. 345.] Dr. Clanton found Plaintiff had mild limitations in activities of daily living and moderate limitations in both maintaining social function and in maintaining concentration, persistence or pace.  [R. 347.]  In a Mental RFC performed the same day, Dr. Clanton, addressed Listings 12.02 and 12.09, and he found Plaintiff moderately limited in the following areas:

1.    The ability to understand and remember detailed instructions
2.    The ability to carry out detailed instructions
3.    The ability to interact appropriately with the general public
4.    The ability to set realistic goals or make plans independently of others

[R. 352.]

26

Evidence of Plaintiff's IQ test results are as follows:

| Date | Test | Results |
|------|------|---------|
| 2009 | WAIS | Verbal IQ 70; Performance IQ 68; **Full Scale IQ 66** |
| 2009 | WRAT-3 | Reading 88, Spelling 76, Arithmetic 75 (and Reading 76, Arithmetic 67) |
| April 1992 | Slosson Intelligence Test-R | 77 |
| April 1992 | Revised Beta | IQ 67 |
| June 1992 | WAIS-R | Verbal IQ 79, Performance IQ 70; **Full Scale IQ 74** |
| 1992 | Peabody Picture Vocabulary Test | IQ 77 |
| 1992 | Vineland Social Maturity Scale | Social Quotient of 60 |

[R. 18–30.]

### The ALJ's Decision

### Evidence of Deficits in Adaptive Functioning

In his decision, the ALJ concluded that "the record supports somewhat that the claimant has significantly subaverage general intelligence. Similarly, the record suggests, although it fails to confirm, that the deficits manifested prior to age 22. However, the record does not corroborate that the claimant has the requisite significant limitations in adaptive functioning as required under listing 12.05 Mental Retardation." [R. 25.] In drawing this conclusion, the ALJ explained as follows:

27

In addition to the discussion in the record as a whole, I offer the following as a brief summary of the claimant's level of adaptive functioning.

With respect to communication, the claimant retains the ability to convey information. She understands the message being expressed and she expresses her own thoughts through words and actions. For instance, at the vocational analysis in 1992, the claimant could read and comprehend. The claimant was proficient in comprehension of words, phrases, and sentences (1F). At the consultative examination with Dr. Kirby, the claimant was very personable, laughed easily, and had a good sense of humor. Her concentration was good and her memory skills adequate. . . .

With respect to self-care and home living, the claimant retains the ability to navigate through everyday situations involving grooming, feeding, and independent living skills. The claimant lives alone. At the vocational analysis in 1992, her academic skills were sufficient for everyday functioning. The claimant was caring for two young children at that time (1 F). She cleans her apartment and does basic cooking(5F, 5E, and testimony).

With respect to social/interpersonal skills, the claimant retains the ability to interact with others and to process figurative language and read unspoken cues such as body language. She sometimes starts small talk when she meets people she knows and sometimes chooses not to say embarrassing things in public. She understands that others do not know her thoughts unless she tells them and is sometimes careful talking about personal things. She does date (5F). The claimant interacts with her peers at the Adult Center and with her close family members when they visit. The claimant does not like the police, but she reported that she gets along okay with authority figures at times. The claimant's presentation at the hearing was largely socially appropriate. The claimant shops in stores. She has had problems with altercations with coworkers, but the claimant explained that these incidences were "years ago" (5F, 6F, 5E, and testimony).

With respect to use of community resources, the claimant is able to navigate through situations by using the means provided by the community. The claimant has participated in activities at the Adult Activities Center for many years. She shops in stores. The claimant rides in cars and vans. The

claimant goes outside alone. The claimant has not indicated that she could not use public transportation. She sometimes watches programs for information. She obeys time limits for breaks and understands the right to complain about legitimate problems when dissatisfied with services. She notifies her supervisor when she will be late or absent and has earned money at part-time jobs for over 18 years. She attempts to improve job performance after receiving constructive criticism from her supervisor and she manages her own money (5F, 6F, 5E, and testimony).

With respect to self-direction, the claimant completes day-to-day activities without guidance. The claimant lives alone, cleans her apartment, cooks at least simple meals, and takes her medications independently. The claimant does not need encouragement to complete household chores. The claimant could pay bills and count change. The claimant stated she could do the following without assistance: bathe, dress, take care of her grooming and oral health, and toileting. The claimant could shop, take her medications, cook, do laundry, and use the phone without assistance (5F, 6F, 5E, and testimony).

With respect to functional academic skills, the claimant applies academic skills to everyday situations. The claimant cooks at least simple meals and takes her medications without assistance. The claimant completes puzzles. The claimant had academic skills sufficient for everyday functioning as of the vocational analysis in 1992. Psychological testing in 1992 showed a Standard Score of 77 on the Slosson Intelligence Test-R and scores on the WAIS-R of Verbal IQ 79, Performance 70, and Full Scale IQ 74 (1F). She demonstrated basic skills in her memory for Digits and in her knowledge of Information. The claimant correctly calculated a simple subtraction problem. The results of the WRAT-3 were Reading: Standard score of 88, grade equivalent of high school; Spelling: Standard score of 76, grade equivalent of 6th grade, and Arithmetic: Standard score of 75, grade equivalent of 5th grade. Dr. Phillips indicated that the claimant could manage her funds appropriately (5F, 6F, 5E, and testimony).

With respect to work, the claimant retains the capacity to maintain gainful employment consistent with the limitations in the residual functional capacity. Based on the preponderance of the evidence, as discussed throughout the decision, the

claimant functions in the borderline range cognitively and adaptively rather than in the mentally retarded range.

With respect to leisure, the claimant participates in relaxing activities. She plays simple games that require keeping score and is sometimes a good sport. She goes places with friends without adult supervision. The claimant watches TV and completes puzzles daily. The claimant interacts with her peers at the Adult Center regularly (5F, 6F, 5E, and testimony).

With respect to health, the claimant recognizes when she is ill. She communicates her complaints, and she knows the appropriate steps to seek medical attention, as indicated by her doctors' visits and participation at the consultative examinations. The claimant takes her medications independently. The claimant has at least some insight into her problems. . . .

With respect to safety, the claimant recognizes dangerous activities and situations. She sometimes accepts helpful suggestions from others. She tells the staff her plans and sometimes chooses to avoid dangerous or risky activities. She follows through with arrangements. She sometimes stays away from relationships or situations that are hurtful or dangerous and sometimes controls her anger or hurt feelings due to constructive criticism. She sometimes thinks about what could happen before making decisions but is not aware of potential danger and does not use caution when encountering risky social situations. She sometimes shows respect for co-workers. The claimant lives alone. The claimant indicated that she could go outside unaccompanied other than she needs someone for transportation (5F, 6F, 5E, and testimony).

[R. 25–28.]

### *Analysis*

As explained above, the Administration has expressly declined to mandate standards for determining "deficits in adaptive functioning," recognizing that "the method of measuring the required deficits in adaptive functioning differ" among the four major organizations in the United States dealing with mental retardation, and noting that the

30

"SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 Fed. Reg. 20018–01, at 20022, 2002 WL 661740 (April 24, 2002). The regulations do not "specify what degree of deficit is required (mild versus [moderate], for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." *Blancas v. Astrue*, 690 F. Supp. 2d 464, 477 (W.D. Tex. 2010). However, because a claimant must also show deficits in adaptive functioning to qualify under all four severity levels (A–D) of Listing 12.05, the deficits necessary to satisfy the diagnostic description of 12.05C would appear to be less than the severity criteria of Listing 12.05D, which requires a claimant to show at least marked restrictions in activities of daily living, social functioning, or maintaining concentration, persistence, or pace. *See Linaburg v. Comm. of Soc. Sec.*, C/A No. 1:13CV177, 2014 WL 3101449, at *7–8 n.9 (N.D.W.Va. July 7, 2014) (citing *Nelson v. Astrue*, 2012 WL 373364 (M.D.N.C. Feb. 3, 2012) ("Any other interpretation might reduce Prong 3 of Listing 12.05D to a nullity, something courts generally must avoid.")). "A finding of at least moderate limitations of functioning has been held to be facially in tension with the ALJ's conclusion that a claimant lacks deficits in adaptive functioning." *Id.*

In this case, Plaintiff represents that she has had a mental disability since birth. [R. 228.] Plaintiff indicates she went to school to the eleventh grade in Union County in special education. [R. 93, 228, 263, 310.] Plaintiff also indicates she has worked odd jobs off and on throughout her life, but has been unable to hold down a full-time job with benefits for long. [R. 228.] Most recently, Plaintiff has worked or participated at the Union Service

31

Work Activity Center ("Union Services"), a sheltered work activity center for adults with mental retardation and/or related disabilities, performing housekeeping duties from 1½ to 2 hours per day. [R. 226.] Plaintiff was paid based on a time study conducted at Union Services. [*Id.*] She also worked one day a week outside of Union Services doing housekeeping work. [R. 228.] After having surgery in 2007, however, she was unable to return to this work. [*Id.*] Plaintiff represents she has received services from South Carolina Department of Disabilities and Special Needs ("SCDDSN") since 1992 and has a service coordinator who assists with her medical appointments, completing paperwork, transportation, and any needs she may have. [*Id.*]

As previously stated, the case law indicates that functional academic skills is the primary measure of deficits of adaptive functioning before age 22. *Salmons*, 2012 WL 1884485, at *7. Uncontroverted in the record is the fact that Plaintiff did not complete high school and was in special education classes. [*See* 93, 228, 263, 310.] While these facts are not, in and of themselves, conclusive of deficits in adaptive learning prior to age 22, they are facts which expressly should be considered by the Commissioner. *See, e.g., Jackson v. Astrue*,[12] 467 F. App'x 214, 218 (4th Cir. 2012) (remanding for review of school record, which was "directly material to the final prong of Listing 12.05C—the question of whether [Plaintiff] suffered 'significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period . . . before age 22.'"). It is unclear how, or if, the ALJ considered Plaintiff's educational history (school

[12]In *Jackson*, with respect to functional academic skills, the Court noted that Plaintiff was in special needs classes, dropped out of school in the tenth grade, was unable to obtain her GED, read at a sixth-grade level, and her cognitive functioning was within the "mildly mentally retarded range of intellectual functioning." *Id.*

performance) in determining whether she lacked deficits in adaptive functioning prior to age 22. Moreover, the ALJ's findings that Plaintiff had moderate limitations in social interaction and in her ability to maintain concentration, persistence or pace [R. 13] may be "facially in tension" with his conclusion that Plaintiff lacked the requisite deficits in adaptive functioning to meet Listing 12.05C. *See Linaburg*, 2014 WL 3101449, at *7–8 n.9. Upon review of the evidence considered by the ALJ, and in light of the above, the Court can not conclude that the ALJ's finding that the record does not corroborate the presence of deficits in adaptive functioning prior to age 22 is supported by substantial evidence.[13]

Additionally, while the weighing of evidence related to intellectual functioning is properly left to the ALJ, he must give sufficient reasoning for this Court to conduct a substantial evidence review. The Court notes discrepancies in the evidence regarding Plaintiff's intellectual functioning which were not addressed by the ALJ. For instance, the record contains IQ scores that fall both within and outside of the range for Listing 12.05C. The ALJ clearly gave certain scores outside of the range more weight, but he provided no guidance as to how he reached his conclusion. The ALJ appears to have relied on the WRAT and Slosson testing results, which do not appear to provide a full-scale IQ score, to find that Plaintiff's IQ does not fall within the Listing. [R. 24.] Also, the ALJ did not

---

[13]The fact that Plaintiff was in special education classes and failed to complete high school suggests the presence of deficits in adaptive functioning in the category of functional academic skills. Furthermore, Drs. Horn and Clanton found Plaintiff moderately limited in her ability to understand and remember detailed instructions and carry out detailed instructions. [R. 332, 352.] Dr. Clanton also found Plaintiff limited in her ability to interact appropriately with the general public and to set realistic goals or make plans independently of others. [R. 352.] Additionally, as explained above, the ALJ found Plaintiff to be moderately limited in her social functioning ability and in her concentration, persistence and pace. [R. 13.] These limitations suggest deficits in adaptive functioning in the categories of social/interpersonal skills and work skills.

discuss whether the Slosson, Peabody, and Vineland tests actually provide reliable results under the Administration's own POMS.[14]

Moreover, although the ALJ indicated that he considered each of the test scores given to Plaintiff through the years related to intellectual ability, and it appears that only two of the tests gave an FSIQ score to Plaintiff—in 1992 of 74 and in 2009 of 66—the ALJ rejected the FSIQ score of 66 for the reason that it was not consistent with the longitudinal record, noting that the score was not consistent with Plaintiff's work history, previous scores, and functioning. While evidence of an individual's ability to live independently and hold a job may certainly support a conclusion that the individual is functioning at a higher level than his IQ score suggests, thereby precluding a finding of mental retardation, *see, e.g., Hancock*, 667 F.3d at 474–76, the fact that a claimant is able to work, raise a family, and otherwise live successfully in the community does not necessarily preclude a finding of mild mental retardation where other deficits in adaptive functioning are present. *See Davis*, 2008 WL 1826493, at *4 (fact that Plaintiff had worked for 33 years as a cleaning lady did not bar her award of benefits where her impairment met Listing 12.05C). As explained by the Sixth Circuit in *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 270 (6th Cir.1991):

---

[14]The Administration's Program Operations Manual System states that standardized intelligence test results are essential to the adjudication of cases of alleged mental retardation and that the specific test administered should be reliable, valid, and standardized according to accepted psychometric practice and have normative data relating to a recent cross-section of the general population. Further, where appropriate intelligence testing yields verbal, performance and full scale IQs ("FSIQ"), the lowest result of the three will be determinative of impairment severity. *Program Operations Manual System (POMS) DI 24515.055 Evaluation of Specific Issues Psychological/Psychometric Testing (effective 06/20/2013-Present)*, U.S. Social Security Administration, http://secure.ssa.gov/apps10/poms.nsf/lnx/0424515055 (last visited Dec. 19, 2014).

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment of those with the disorder—about 85%. People with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0–5), have minimal impairment in sensorimotor areas, and often are not distinguishable from normal children until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

*See also Durden v. Astrue*, 586 F. Supp. 2d 828, 839 (S.D. Tex. 2008) ("While [gardening, driving and performing household chores] would tend to support a finding that [claimant] does not have deficits in certain areas of adaptive functioning, they do not necessarily negate a finding of such deficits in other areas.").  In fact, Listing 12.05C assumes the ability to work at unskilled jobs.  *See Shaw v. Astrue*, No. 4:08-CV-132-D(2), 2009 WL 2486932, at *6–7 (E.D.N.C. Aug. 13, 2009) ("However, the fact that a claimant has been able to work in the past does not necessarily suggest that the claimant does not satisfy the deficits in adaptive functioning requirement.... 'Listing 12 .05(C) assume[s] many, if not most, mildly mentally retarded individuals will be able to work ... [but that they may] subsequently become disabled due to the development of additional severe impairments.'") (*quoting Muntzert v. Astrue*, 502 F. Supp. 2d 1148, 1158 (D.Kan. 2007)).  Of course, in this case, Plaintiff's present work as a "house keeper" for a few hours a day is accomplished at the direction of the SCDDSN and with her assigned service coordinator (who assists with her medical appointments, completing paperwork, transportation, and any needs she may

have).[15]  Accordingly, this Court cannot say that substantial evidence supports the ALJ's decision to rely on the WRAT and Slosson testing, and FSIQ score of 74, over the FSIQ score of 66, without explaining why he determined certain tests to be more reliable, and to reject the FSIQ score of 66 due to Plaintiff's work as a house keeper when case law indicates that if the 12.05C criteria are met then benefits are due despite prior work efforts.

**Plaintiff's Remaining Arguments**

Because the Court finds the ALJ's failure to properly consider Listing 12.05C is a sufficient basis to remand the case to the Commissioner, the Court declines to specifically address Plaintiff's additional allegations of error by the ALJ.  However, upon remand, the Commissioner should take into consideration Plaintiff's remaining allegations of error.

**CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends the Commissioner's decision be REVERSED and the case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action consistent with this recommendation.

**IT IS SO RECOMMENDED**.

s/Jacquelyn D. Austin
United States Magistrate Judge

December 23, 2014

---

[15] It is unclear to this Court how the ALJ reconciled the fact that Plaintiff's present work as a "house keeper" for a few hours a day at the direction of the SCDDSN and/or the fact that Plaintiff has an assigned service coordinator (who assists with her medical appointments, completing paperwork, transportation, and any needs she may have) with the his determination that Plaintiff is able to work in the national economy as a housekeeper as it is generally performed.  On remand, the ALJ should provide some discussion of how he considered this evidence so that the Court can provide meaningful review.

Greenville, South Carolina